# In the United States Court of Federal Claims

No. 15-152 C

(E-Filed: January 29, 2016)

|  |  |  |
|---|---|---|
| BEARD ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | Forest Service stewardship, breach of |
| | ) | contract, contract interpretation, lost |
| v. | ) | profits, reasonably foreseeable |
| | ) | damages |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>David D. L. Horton</u>, Palm Springs, CA, attorney for plaintiffs.

<u>Steven J. Gillingham</u> and <u>Vincent D. Phillips</u>, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, DC, for defendant.

## OPINION AND ORDER

<u>CAMPBELL-SMITH</u>, Chief Judge

Plaintiffs Dennis and Kimberly Beard ("Plaintiffs" or "the Beards") are the former owners of Dinkey Creek Inn, a seasonal resort located in the Sierra National Forest and subject to administration by the United States Forest Service ("Forest Service"). Plaintiffs operated this resort pursuant to a term special use permit ("permit" or "Permit Agreement"), which granted the Beards long-term use of the land in exchange for an annual fee. Plaintiffs allege that the Forest Service violated the terms of the permit by allowing a logging contractor to harvest timber in a manner that "unduly interfered" with the "rights and privileges" conferred on plaintiffs by the permit. Plaintiffs seek a wide array of damages, including lost profits and compensation for aesthetic harm and loss of timber.

On June 25, 2015, defendant moved for summary judgment, pursuant to Rule 56(a) of the Rules of the Court of Federal Claims ("RCFC"). Defendant argues that its conduct did not breach the terms of the permit and was consistent with its statutory duty

to reduce the risk of forest fire by conducting thinning operations and removing undergrowth.  Defendant also argues that even in the event of a breach, it is entitled to summary judgment because the damages claimed by plaintiffs are speculative.  For the following reasons, the court grants defendant's motion for summary judgment.

I.      BACKGROUND.

A.      The Forest Service's Mission to Manage National Forests.

The Multiple Use-Sustained Yield Act of 1960, Pub. L. 86-517, authorizes the Secretary of Agriculture to establish and administer national forests throughout the United States "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."  16 U.S.C. § 528.  The United States Forest Service is charged with administering and managing these forests.  See, e.g., 16 U.S.C. §§ 551, 551a.

One of the missions of the Forest Service is "to reduce wildfire risk to communities, municipal water supplies, and other at-risk Federal land through a collaborative process of planning, prioritizing, and implementing hazardous fuel reduction projects."  16 U.S.C. § 6501(1).  Consistent with this stewardship role, and with its role in managing the supply of timber as set forth in § 528, the Forest Service has the authority to sell timber by contracting with private timber harvesting companies.  16 U.S.C. § 472a.

Also, pursuant to the Term Permit Act of 1915, the Forest Service has the authority to issue permits for the construction and operation of hotels and resorts in National Forests, for a term not exceeding thirty years.  16 U.S.C. § 497.  Forest Service regulations define a permit as "a special use authorization which provides permission, without conveying an interest in land, to occupy and use National Forest System land or facilities for specified purposes, and which is both revocable and terminable."  36 C.F.R. § 251.51 (2013).

B.      The Permit Agreement Between the Beards and the Forest Service

In 1981,[1] the Forest Service granted the Beards a Term Special Use Permit covering a 3.68 acre site subject to administration by the Forest Service.  The site is located near Shaver Lake, California, in the Sierra Nevada Forest, and is home to the seasonal resort known as Dinkey Creek Inn.  Term Special Use Permit, Def.'s App. at 1, June 25, 2015, ECF No. 11-1, ("Permit"); Sec. Am. Compl. ¶ 15, June 7, 2015, ECF No. 10 ("Compl.").

---

[1] The original permit was granted in 1981.  The permit proffered by the parties is an updated version of the original permit, signed in 1991.

The Forest Service granted this permit "for the purpose of [c]onstructing, maintaining, and operating" the following:  "A Store for sale of general merchandise, off sale liquors and campfire-wood-bundles, with lunch counter, Gasoline, Butane and Oil Facility, Mailbox, Parking Area, ten (10) Rental Cabins[], Managers Residence[], Storage Building, Public Restrooms, Public Shower and Laundry, Water Storage Tank, enclosed system Dump Station, Restaurant with beer and wine service."  Permit (prefatory remarks), Def.'s App. at 1; Compl. ¶ 15; see also http://dinkeycreekinn.com.

In exchange, plaintiffs agreed to pay an annual fee, which would be adjusted "on a basis commensurate with the value of use authorized by th[e] permit."  Permit ¶ 2, Def.'s App. at 1.  To this end, the Permit Agreement required plaintiffs to submit financial statements detailing the costs and revenues from their use of the land.  Permit ¶ 2A, Def.'s App. at 2-7.

A number of the permit's clauses impose requirements on plaintiffs.  For instance, clause 5 states that "[t]he permittee shall maintain the improvements and premises to standards of repair . . . and safety acceptable to the forest officer in charge."  Clause 8 requires the permittee to "take all reasonable precautions to prevent and suppress forest fires." Clause 9, similarly, requires the permittee to "exercise diligence in protecting from damage the land and property of the United States" and to repay the government for any damage resulting from negligence on the part of permittee.  Clause 21 prohibits the permittee from engaging in invidious discrimination against employees or customers.  Clause 23 imposes on "[t]he holder" of the permit "responsibility [for] inspecting the site" to prevent and remove "hazardous conditions."  Clause 25 requires "the holder" to "protect the scenic esthetic values of the area under the permit," and Clause 26 requires "the holder" to "take reasonable measures to prevent and discourage vandalism or disorderly conduct."

Other clauses impose obligations on both plaintiffs and the government.  For instance, clause 42, which is entitled "Timber Cutting," permits the Forest Service to "sell or otherwise dispose of standing merchantable timber to third parties" provided that this is done "without undue interference with the operation of the holder."  Clause 58 requires the holder "to permit the free and unrestricted access to and upon the premises at all times."  However, such access must be for "lawful and proper purposes not inconsistent with the intent of the permit or with the reasonable exercise and enjoyment by the holder of the privileges thereof."  Finally, pursuant to clause 66, "the Forest Service reserves the right to use or permit others to use any part of the permitted area for any purpose" as long as "such use does not interfere with the rights and privileges hereby authorized."  The balance and application of these rights, as found in clauses 42, 58, and 66, are subject to dispute in this case.

C.      Development Undertaken in Accordance with the Terms of the Permit

Clause 37 requires the holder and the Forest Service to jointly prepare "a schedule for the progressive development of the permitted site and installation of facilities . . . by December 1, 1992, [setting] forth an itemized priority list of planned improvements and due date for completion. . . . . All required plans and specifications for site, improvements, and structures included in the development schedule shall be submitted to the Forest Service at least [45] days before the construction date stipulated in the development schedule."  In accordance with clause 37, plaintiffs submitted a site development plan in 1992.  See Def.'s App. at 26 – 27.

In 1993, the Forest Service approved a site development plan, which among other things permitted the Beards to construct and operate a restaurant and up to ten chalet cabins.  Id.  As plaintiffs points out, "[p]erformance of the duties under this Agreement required the Beards to make a substantial investment and take a substantial risk."  Compl. ¶ 17.  In fact, between 1993 and 2011, the Beards completed the construction of four cabins.  See Beard Decl. at ¶¶ 5 – 6, 10, ECF No. 12.[2]

On May 3, 2001, however, plaintiffs sent a letter to Mr. Ray Porter, the District Ranger, advising that they had abandoned their plans to build a restaurant:

> We would also like to confirm our discussions about any future development under our current permit. As we discussed, the restaurant that is currently approved for construction will probably never happen. Sales in our current cafe are down and there is no apparent need for a full service, full size restaurant in the area.

Def.'s App. at 220.  In that same letter, the Beards also addressed the matter of the six chalets that had been approved but not yet constructed:

> As for the Chalets, we explained that although they are full to capacity during the months of June, July & August, we currently do not have enough of a waiting list during the summer months to justify building additional cabins at this time. Our business during the winter months consists primarily of weekends, and the cabins are currently renting at a lower fee than those in Shaver Lake, probably due to our location. There may be a need in the future given the growth in California's population, but not currently."

Id.

---

[2] The Beard Declaration is attached to plaintiffs' opposition brief.  See Pl.'s Opp'n at 23-30, July 27, 2015, ECF No. 12.

The parties dispute whether plaintiffs' plans to build the remaining chalets had been completely "abandoned," as the government argues, or merely delayed, as plaintiffs argue.  See Def.'s Mot., ECF No. 11, at 12-13; c.f.  Beard Decl. at ¶¶ 5-6, 12, 14, ECF No. 12.  Mr. Porter, the District Ranger who interacted directly with plaintiffs on the matter, avers the following:

> The Beards did not raise the issue of building new cabins again with me or my staff after sending this letter in 2001.  I did not receive any further requests from the Beards to build new cabins at the site.  If they had made a request to build new cabins after 2001, the Forest Service would have had to reevaluate the request because changes were implemented in the Forest plans in 2001 and 2004 that might not allow [the] Beards to construct new cabins on the land that they had proposed in the earlier 1990s.

Decl. of Ray Porter, Def.'s App at 216, ECF No. 11-3.  Characterizing the Beards' decision not to build the additional cabins as "a business decision," Mr. Porter explained that instead of building the additional cabins, the Beards decided to "focus[] on other streams of revenue like snowmobile trails and building an RV park."  Id.

In response, plaintiffs argue that they did not express an intention to abandon construction of the remaining cabins in their 2001 letter; instead they had noted that "there may be a need in the future given the growth in California's population."  Beard Decl. at ¶ 6; Pl.'s Opp'n at 13.  Plaintiffs assert that "as a result of the growth in California's population, [they] began working on the infrastructure needed to support the final six (6) chalets authorized under the current permit—the permit issued prior to 2002."  Pl.'s Opp'n at 13.  As Mr. Beard points out in his Declaration, "[Ms.] Nancy Woolsey (retired FS officer in charge of my permit) understood [our intent] to build at some time in the future as she told me that since we already had installed the water, septic, and electric services in preparation of the additional chalets, [we] should look into the portable cabins like they were using at one of the resorts in Huntington Lake."  Beard Decl. at ¶ 10.

D.     The 2011 Events Underlying Plaintiffs' Claims

The events underlying plaintiffs' complaint transpired in October and November 2011.  Plaintiffs argue that the removal of trees from a portion of the permitted area impeded their ability to construct three of the cabins that had been approved in 1993, pursuant to the site development plan.

On January 24, 2011, the Forest Service issued a solicitation for "Dinkey North Stewardship."  See Dinkey North Stewardship Solicitation, Def.'s App. at 57 – 108. Project objectives included removing sawtimber and biomass materials in an effort to "[r]educe fire severity and restore a fire-resilient forest structure," "[i]mprove forest

health," and "[e]nhance habitat conditions for sensitive species of plants and wildlife in the project area."  Id. at 62; see also Def.'s Mot. for Summ. J. at 5, June 25, 2015, ECF No. 11.

This solicitation included many requirements, including the following:  "So far as practical, Contractor shall protect roads and other improvements," including "buildings" and "below-ground water pipes and storage tanks."  Id. at 87.  The Solicitation also required the Contractor to "make timely restoration of any such improvements damaged by Contractor's Operations."  Id.

In October 2011, the Forest Service entered into a contract with Sierra Forest Products to remove timber from land that included the area covered by plaintiffs' permit.  Compl. ¶ 28; see also Pl.'s Mem. for Forest Service Claims Dep't, Def.'s App. at 114.

Plaintiffs allege that on October 12, 2011, Mr. Kirby Mullen of Sierra Forest Products informed them that at the earliest, "the logging crew would be removing trees near the Dinkey Creek Inn area in approximately one (1) week."  Pl.'s Mem. for Forest Service Claims Dep't, Def.'s App. at 114.  According to plaintiffs, Mr. Mullen assured them that they would be contacted before beginning the logging operation.  Id.  But when plaintiffs arrived at Dinkey Creek Inn on October 16, 2011, they found that 26,074 square feet (a little over half an acre) of the land covered by the permit had already been "clear cut" to create a log landing area.[3]  Id at 116.; see also Beard Decl. at ¶ 21.  Plaintiffs indicate that "approximately 120 merchant[able] trees were taken down" from the land cleared for the log landing area.  Pl.'s Mem. for Forest Service Claims Dep't, Def.'s App. at 116.  Plaintiffs add that they had not been provided with any warning.  Id. at 114-15; see also Beard Decl. at ¶ 13.

Upon further inquiry, plaintiffs learned that Mr. John Martin, a Forest Service officer, approved the location of the landing area, without contacting plaintiffs, two days after Mr. Mullen had advised plaintiffs of the impending tree removal.  Pl.'s Mem. for FS Claims Dep't, Def.'s App. at 115.  Mr. Martin later informed plaintiffs that he did not know that the landing area had been slated for the development of three chalets, under the terms of the permit.  Id; Compl. ¶¶ 30 – 31.

Three days after the approval of the landing area, plaintiffs visited the site with Mr. Martin and Mr. Keith Ballard, the Chief Forrester.  According to plaintiffs, Mr.

---

[3] Defendant explains that "[t]ree removal involves more than just felling standing trees; after the standing timber is felled, it needs to be cut into smaller logs for transport to mills, and this task is completed on site in an area known as a log landing, which is where the logging company cut the trees and shredded the other debris."  Def.'s Mot. for Summ. J. at 5-6.

Ballard "was astounded by the lack of communication [by] the forest service personnel and logging crew with the permittees and the destruction to their permitted land." Pl.'s Mem. for FS Claims Dep't, Def.'s App. at 115. According to Mr. Beard, when Mr. Ballard viewed the damage first hand, "[h]e appeared to be visibly very upset and stated that '[Mr. Martin] should have known better.'" Beard Decl. at ¶ 22.

On October 29, 2011, plaintiffs left a voice message for Mr. Martin, requesting an estimate as to when the logging crew would return to their permitted area to finish the tree removal. Pl.'s Mem. for Forest Service Claims Dep't, Def.'s App. at 115. Less than two weeks later, Mr. Mullen informed plaintiffs that his company would be logging in the Dinkey Creek area later that day. Id.

That afternoon, plaintiffs met Mr. Joel Pelayo, of Joel Pelayo Logging, at Dinkey Creek. Mr. Pelayo had subcontracted with Sierra Forest Products to assist with the logging. Id. Plaintiffs showed the location of the septic tank and the gas and water lines to Mr. Pelayo, who assured them that he would avoid those areas. Id. But when plaintiffs returned to Dinkey Creek on November 20, 2011, they found a large mountain of slash piled on the area that had been flagged as the septic tank. Id. at 116.

On November 23, 2011, plaintiffs received a phone call from Mr. Mullen, informing them that the lid of the septic tank had collapsed, and that the loader had fallen into the septic tank. He told plaintiffs that on November 28, 2011, a repair person would be dispatched to fix the septic tank lid. Id. The septic tank was repaired timely, but the repair was performed without a county permit, was not inspected and was not approved, nor were the leach lines inspected for damage. Id.

E.     Negotiations Between the Beards and the Forest Service

Plaintiffs maintain that the decision to locate the landing within the permitted area was a mistake. Plaintiffs assert, and defendant does not dispute, that the Forest Service failed to inform the logging company about the location of their permitted area. As support for their claims, plaintiffs rely on the admission by Mr. Martin, a Forest Service officer, "that he would never have done it had he known that [the cleared area] was part of [the Beards'] permit (but he also never checked)." Beard Decl. at ¶ 23. Because the site for the landing was not chosen by necessity, plaintiffs contend that it could have been located elsewhere without compromising the Forest Service's stewardship operation.

It does appear that the parties discussed options for addressing the harm caused to plaintiffs by the creation of the log landing. According to plaintiffs, upon viewing the landing site in person, Mr. Ballard, the Forest Supervisor, informed them that he would notify Mr. Porter, the District Ranger, about the miscommunication. Pl.'s Mem. for Forest Service Claims Dep't, Def.'s App. at 115. Subsequently, plaintiffs met with Mr.

Porter.[4]  Mr. Porter told plaintiffs that Mr. Ballard had recommended compensating plaintiffs "for the loss."  Beard Decl. at ¶ 25.  According to plaintiffs, Mr. Porter also suggested expanding the boundaries of the land covered by the permit "to make up/substitute for the destroyed section of [plaintiffs'] permit."  Id.  Plaintiffs did submit an application proposing to expand the permitted area, consistent with Mr. Porter's suggestion.  Id. at ¶ 26.  That proposal eventually was dismissed.  Id. at ¶ 27.

Although the Forest Service rejected the proposal to expand the bounds of the permitted area, it does seem to have made other efforts to address the Beards' grievances.  On January 25, 2012, the Beards requested that the Forest Service restore vegetation to the area that had been cleared to make the log landing.  See Letter from Ray Porter to the Beards, April 25, 2012, attached in Def.'s App. at 178, ECF No. 11-3.  In a meeting held on March 12, 2012, the Forest Service agreed to replant the area with approximately 40 trees, 10 of which would be from eight to twelve feet tall and 30 of which would grow three to four feet tall.  Id.  The Forest Service also agreed to place rock barriers along the edge of the road where the landing was located to prevent any access to vehicles.  Id.

The tree planting was completed on May 29, 2012.  Def.'s Mot. at 7 (citing Def.'s App. at 211).  But only one of the larger trees that were planted survived.  Mr. Beard explains: "The property remains barren and uninviting. Even if all nine [larger trees] had survived, it would take no less than 30 years for them to be tall enough to provide any shade or aesthetic value; there were several one [to] two [foot] tall trees planted, which will take even longer [to grow]."  Beard Decl. at ¶ 28.

Characterizing the reforestation efforts of the Forest Service as evidence of "good faith" rather than as mitigation efforts, defendant notes that replanting "was not required under the [p]ermit."  Def.'s Reply at 7, ECF No. 14.  As to the death of many of the replanted trees, the government observes: "That some trees may not have survived supports neither a breach nor bad faith finding, especially in an area of the country experiencing persistent, devastating drought."  Id.

F.     Procedural History

On July 27, 2012, the Beards filed an administrative claim with the United States Department of Agriculture.  See Beards Adm. Claim, Def.'s App. at 111-25.  The Beards argued that the decision to create a landing on the permitted area was negligent and a breach of the permit.  The Beards sought, inter alia, lost rent, reasoning that the clear cutting prevented them from constructing three of the cabins that had been "slated for future development."  Id. at 119-25.

---

[4] The precise date of this meeting is unclear.

On September 2, 2014, the Forest Service denied the Beards' administrative claim. In rejecting the claim, the agency noted that the Beards had a pending action in the District Court for the Eastern District of California, which the Beards had filed on July 2, 2014. Id. at 183-84.

In the district court action, the Beards asserted negligence and breach of contract claims against the Forest Service and the logging company. The Beards voluntarily dismissed their claims against the United States on December 3, 2014, and eventually settled the tort claims with the logging company for $15,000. The settlement agreement was executed on January 1, 2015. Id. at 204.

On February 18, 2015, plaintiffs filed the present action. The Beards alleged that the harvesting action breached the terms of the permit. The Beards sought lost profits and an array of other damages, including damages for aesthetic harm, loss of resort revenue due to aesthetic harm, loss of merchantable timber, loss of esthetic value, and pre-judgment interest. Plaintiffs added a number of other claims based on tort and California state law. See Original Complaint, Feb. 18, 2015, ECF No. 1.

On June 7, 2015, plaintiffs filed a second amended complaint.[5] In addition to the breach of contract claims alleged in the original complaint, plaintiffs argued that the agency's actions effected a taking of private property without just compensation, in violation of the Fifth Amendment of the United States Constitution. Sec. Am. Compl. ¶¶ 53-67, 71-74, ECF No. 10.

On June 25, 2015, defendants filed a motion for summary judgment, which is now ripe for a ruling. Mot. for Summ. J., ECF No. 11.

II.   APPLICABLE LEGAL STANDARDS

The Tucker Act confers on the Court of Federal Claims jurisdiction over "any claim against the United States founded either upon the Constitution . . . or upon any express or implied contract with the United States . . . in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). As explained above, plaintiffs press two claims against the Forest Service: one alleges a breach of contract with the United States, and the other alleges a taking of private property in violation of the Fifth Amendment of the U.S. Constitution. Properly understood,[6] defendant does not dispute the court's jurisdiction over these two

---

[5] Plaintiffs filed a first amended complaint on June 6, 2015, and a second amended complaint on June 7, 2015. The court cannot distinguish any difference between the two amended complaints.

[6] Defendant argues that the court lacks jurisdiction to hear plaintiffs' implied breach of contract claim on the ground that the government is not actually bound by the implied

claims, and the court finds that it does, in fact, have jurisdiction to hear them under the Tucker Act.

Rather, defendant, moves for summary judgment.  Under RCFC 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."  Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 805, 806 (Fed. Cir. 1999).  Accordingly, in considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party without weighing the evidence or making credibility determinations.  Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Mere conclusory allegations are not sufficient to withstand summary judgment, for a dispute is "genuine" only if there are factual issues that "[might] reasonably be resolved in favor of either party."  Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)).  Moreover, a factual dispute is "material" only if it "affect[s] the outcome of the suit" in light of the substantive law governing the suit.  Marriott, 586 F.3d at 968 (quoting Anderson, 477 U.S. at 250).  The party opposing the motion has the burden of proving by sufficient evidence that a genuine issue of material fact actually exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 324–25 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970).

At the summary judgment stage, plaintiffs, as the non-moving party, are not required to succeed on the merits.  Nonetheless, "on an issue for which the moving party does not have the burden of proof," the moving party can prevail "by providing evidence that negates an essential element of the opposing party's case" or by demonstrating "that the evidence [presented by plaintiffs] establishes no material issue of fact and that [plaintiffs] will not be able to prove an essential element of [their] case." Vivid Techs., Inc., 200 F.3d at 807.

---

duties identified by plaintiff.  But, as the court explains in the discussion that follows, a failure of proof on the part of a plaintiff goes to the merits of an argument, not the court's jurisdiction.  See, e.g., Jan's Helicopter Serv., Inc. v. F.A.A., 525 F.3d 1299, 1307 (Fed. Cir. 2008).  Otherwise, defendant does not dispute the court's jurisdiction to hear plaintiffs' breach of contract claims.

III.   DISCUSSION

In the Amended Complaint, plaintiffs offer, in scattershot form, arguments based on an array of theories, including tort, California state law, implied breach of contract, express breach of contract, as well as a taking claim under the Fifth Amendment of the U.S. Constitution.

As defendant points out in its motion for summary judgment, this court has no jurisdiction over claims sounding in tort or based on a violation of state law.   Mot. Summ. J. at 19-20; see also 28 U.S.C. § 1491(a)(1) (expressly precluding jurisdiction over claims sounding in tort); Boyle v. United Techs. Corp., 487 U.S. 500, 504 (1988) (holding that federal contracting is a "uniquely federal interest" and is governed exclusively by federal law).  Additionally, as defendant observes, a breach of rights voluntarily created under a contract with the United States cannot give rise to a taking claim.  See Mot. for Summ. J. at 20-21 (citing Hughes Commc'n Galaxy, Inc. v. United States, 271 F.3d 1060, 1070 (Fed. Cir. 2001)).  As defendant further observes, plaintiffs have contractual rights to use the permitted area, but have no property interest in the land itself, which as part of a national forest, is the property of the United States.  Def.'s Mot. for Summ. J. at 20-21.

It appears that plaintiffs have belatedly recognized the futility of these claims, as they elected not to discuss or defend them in their opposition to defendant's motion for summary judgment.  Accordingly, the court finds that plaintiffs have abandoned these claims and no further consideration of them is necessary.

The court now turns to consider plaintiffs' remaining claim: namely, that defendant's conduct breached the terms of the permit by violating "implied reciprocal duties" as well as duties expressly set forth in the contract.

A.     Standards for Evaluating Breach of Contract Claims against the Government

"To prevail on a breach-of-contract claim, the plaintiff bears the burden of proving: (1) the existence of a valid contract between the parties; (2) a duty arising from the contract; (3) a breach in duty; and (4) damages caused by the breach." Liberty Ammunition, Inc. v. United States, 119 Fed. Cl. 368, 388 (2014) (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989)).  "'Whether a contract creates a duty is a legal question of contract interpretation,' and therefore [is] amenable to summary judgment."  Grand Acadian, Inc. v. United States, 87 Fed. Cl. 193, 198 (2009) (quoting San Carlos, 877 F.2d at 959).

"The remedy for breach of contract is [to award] 'damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed.'" Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing San Carlos Irr. & Drainage Dist. v. United States, 111 F.3d 1557, 1562 (Fed. Cir. 1997)).  The injured party, however, may only recover if: "(1) the damages were reasonably foreseeable; (2) there is a causal connection between damages and the breach; and (3) the amount of recovery is not speculative."  Id.

In determining whether a party is in breach of contract, the court applies the following rules of contract interpretation.  "Contract interpretation begins with the language of the written agreement."  Bell/Heery v. United States, 739 F.3d 1324, 1331 (Fed. Cir. 2014)) (quotations omitted).  If the contract language is unambiguous, then it must be given its plain and ordinary meaning, such as "would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances."  TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) (quoting Metric Constrs., Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999)). In construing the meaning of a contractual provision, the court does not interpret the disputed term or phrase in isolation, but "construes contract terms in the context of the entire contract, avoiding any meaning that renders some part of the contract inoperative." Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1288 (Fed. Cir. 2008).

B.      The Court Rejects Plaintiffs' Argument That the Forrest Service Breached "Implied Reciprocal Duties"

Plaintiffs assert that ¶ 9 of the permit creates an "implied reciprocal duty" on the part of the Forest Service to exercise diligence in protecting the property, and that ¶ 25, likewise, creates an "implied reciprocal duty" to protect the aesthetic and scenic value of the property.  Compl. ¶¶ 40-45.  Plaintiffs allege that the Forest Service's decision to allow "clear cutting" of a portion of the permitted area to create a log landing area breaches both of these duties.  Id. at 45 – 48.

Clause 9 of the permit states:

The permittee shall exercise diligence in protecting from damage the land and property of the United States covered by and used in connection with this permit, and shall pay the United States for any damage resulting from negligence or from the violation of the terms of this permit or of any law or regulation applicable to the National Forests by the permittee, or by any agents or employees of the permittee acting within the scope of their agency or employment.

Permit ¶ 9.  Clause 25, entitled "esthetics," states:

> The holder shall protect the scenic esthetic values of the area under this permit, and the adjacent land, as far as possible with the authorized use, during construction, operation, and maintenance of the improvements.

Permit ¶ 25.

As defendant points out, both clauses impose explicit obligations on "the holder" (that is, plaintiffs); but neither clause mentions the Forest Service. Defendant argues that "[t]his court 'may only find an implied-in-fact contract when there is no express contract'" covering the same topic. Defendant contends that an express contract exists on the very subject matter, and that this deprives the court of "jurisdiction over the Beards' implied claims." Def.'s Mot. Summ. J. at 10 – 11 (citation omitted).

Cautioned by the Federal Circuit about confusing "the distinction between subject matter jurisdiction and the essential elements of a claim for relief," the court finds that defendant erred in framing this as a jurisdictional issue. Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1353 (Fed. Cir. 2011) (citing Arbaugh v. Y & H Corp., 546 U.S. 500, 503, 511 (2006). For purposes of establishing jurisdiction, it is sufficient that plaintiff make a non-frivolous allegation. Jan's Helicopter, 525 F.3d at 1309 (distinguishing between jurisdiction and the merits in the context of a takings claim). "The merits of the claim [are] not pertinent to the jurisdictional inquiry." Jan's Helicopter, 525 F.3d at 1307 (discussing United States v. White Mountain Apache Tribe, 537 U.S. 465 (2003)). To be clear, jurisdiction is the court's power to hear a case; jurisdiction "is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." Do–Well Mach. Shop, Inc. v. United States, 870 F.2d 637, 639 (Fed. Cir. 1989) (quoting Bell v. Hood, 327 U.S. 678, 682 (1989)).

It is uncontroverted that a valid contract exists between plaintiffs and the Forest Service. Thus, the issue before the court is not whether the court has jurisdiction over these claims but whether the contract actually includes the implied duties identified by plaintiffs. This is not a jurisdictional question but a matter of contract interpretation, that is, a legal question rather than a factual one. The cases cited by defendant in support of the proposition that an implied contract cannot exist when an express contract already covers the same subject matter do not apply here. But similar principles of contract interpretation do support defendant's position.

As plaintiffs concede, the actual language of clauses 9 and 25 impose duties on plaintiffs, not the government. See Compl. ¶ 40 ("Section 9 of the Permit

Agreement requires the Beards to exercise diligence in protecting the National Forest land"); Compl. ¶ 43 ("Section 25 of the Permit Agreement requires the Beards to protect the aesthetic and scenic value of the area under the Permit Agreement").  Specifically, clause 9 provides that "the permittee shall exercise diligence in protecting from damage the land," and clause ¶ 25 states that "the holder shall protect the scenic and esthetic values of the area."  (emphasis added).

To infer a reciprocal agreement would be inconsistent with the plain language of these provisions.   Clause 9 clearly defines a duty that is owed by plaintiffs to the government: "The Permittee shall exercise due diligence in protecting from damage the land . . . and shall pay the United States for any damage resulting from negligence or from the violation of the terms of this permit."  Permit ¶ 9 (emphasis added).  Similarly, clause 25 requires "the holder [to] protect the scenic esthetic values of the area . . . during construction, operation, and maintenance of the improvements."  (emphasis added).  Because this clause refers to improvements made by the holder, the duty to protect can be inferred only to the holder.

In construing the permit, the court looks to the canon of textual interpretation that the expression of one thing implies the exclusion of others (expressio unius est exclusio alterius).  See, e.g., Legal Aid Soc. of New York v. United States, 92 Fed. Cl. 285, 299 (2010) ("[I]t is well-settled that [w]here certain things are specified in detail in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication.") (internal quotations omitted).

Plaintiffs provide no grounds for ignoring this interpretive principle, other than stating in a conclusory manner that "the aesthetic and scenic value of the property is the only purpose for either party to enter into the Permit Agreement." Compl. ¶¶ 41, 44 (emphasis added).  The notion that "the only purpose" of the contract from the perspective of the government is aesthetic is plainly wrong: as explained above, the Forest Service has a statutory mission to protect and steward the national forests, which includes cutting down trees to reduce the risk of wildfire.  See 16 U.S.C. § 6501(1).  Consistent with this duty, the contract contains provisions that specifically allow defendant to engage in its stewardship activities. See, e.g., ¶¶ 42 (Timber Cutting), 58 (Area Access), and 66 (Nonexclusive Use).

Moreover, plaintiffs' implied reciprocal duty argument is inconsistent with the interpretive doctrine that a text must be construed as a whole.  Bell/Heery, 739 F.3d at 1331 ("A contract must also be construed as a whole and in a manner that gives meaning to all of its provisions and makes sense.") (internal quotations omitted).  As defendant points out, when defining the rights and duties of the

parties, the contract contains many provisions that single out defendant.  For example, the phrase "the forest service shall…" appears in ¶¶ 5, 16, 21(e), 27, and 59.  Conversely, the permit also contains a number of clauses that single out plaintiffs.  See, e.g., ¶ 2 ("the permittee shall pay to the Forest Service . . ."); ¶ 22 ("the holder shall indemnify the United States"); ¶ 42 ("The holder agrees, as directed by the authorized officer, to cut into commercially usable lengths . . . any and all merchantable timber.").  Examining the contract as a whole, the court finds that clauses 9 and 25 impose obligations on plaintiffs only.

Absent the imposition of a duty on the part of the government, plaintiffs cannot prevail on a breach of contract claim.  Accordingly, the court grants defendant summary judgment as to plaintiffs' "implied reciprocal duty" claims.

C.     Plaintiffs' Express Breach of Contract Claim

1.     The Permit Imposes a Duty on Defendant To Avoid "Undue Interference" with Plaintiffs' Rights under the Permit

In addition to the implied reciprocal duty claims, plaintiffs also argue that clauses 42, 58, and 66 of the Permit Agreement expressly impose on defendant a duty to avoid "undue interference" with the "rights and privileges" conferred on plaintiffs.  Compl. ¶¶ 36 – 37, 46 – 48.  Plaintiffs argue that defendant's decision to allow clear cutting of a portion of the permitted area to create a log landing area breaches this duty.  Defendant, in turn, argues that no such express right exists; according to defendants, "[t]he permit expressly provides the Forest Service with the right to use the land under permit to the Beards in any manner and for any purpose, including removing trees to create a log landing to complete [its] stewardship activities."  Def.'s Mot. Summ. J. at 13.  The court now considers the provisions at issue.

Clause 42, which confers on the Forest Service the qualified right to cut and dispose of timber located in the permitted area, states:

The holder agrees, as directed by the authorized officer, to cut into commercially usable lengths and deck for disposal by the Forest Service, any and all merchantable timber, not needed by the holder for the permitted use, which is cut from the National Forest lands occupied hereunder. This material will be disposed of by the Forest Service provided that the Forest Service may sell or otherwise dispose of standing merchantable timber to third parties when such timber can be felled and removed without undue interference with the operation of the holder.  Unmerchantable material, including tops and branches, shall be disposed of by burning or removal from National Forest Land.

Permit ¶ 42 (emphasis removed).  Clause 58, in turn, confers on the Forest Service a qualified right to access the permitted area, stating:

> The holder agrees to permit the free and unrestricted access to and upon the premises at all times for all lawful and proper purposes not inconsistent with the intent of the permit or with the reasonable exercise and enjoyment by the holder of the privileges thereof.

Permit ¶ 58.  Finally, Clause 66 grants defendant a qualified right to use the permitted area, stating:

> This permit is not exclusive; that is, the Forest Service reserves the right to use or permit others to use any part of the permitted area for any purpose, provided such use does not interfere with the rights and privileges hereby authorized.

Permit ¶ 66.

As an initial matter, the court notes that defendant has mischaracterized plaintiffs' argument by suggesting that the Beards "do not believe the Forest Service had the right to use the land under permit to the Dinkey Creek Inn to conduct stewardship activities."  <u>See</u> Def.'s Mot. Summ. J. at 3.  On the contrary, plaintiffs acknowledged defendant's right under the permit, as well as defendant's statutory duty, to reduce the risk of fire by conducting stewardship activities like cutting.  <u>See, e.g.</u>, Pl.'s Opp'n at 6, n.1.  Instead, plaintiffs contend that "defendant's decision to locate a log-landing and clear-cutting over 16% of the permitted area interfered with its interest, rights and privileges, <u>unnecessarily</u>, and . . . in contravention with the purpose of the Special Use Permit and . . . unduly (unreasonably) interfered with plaintiffs' resort operations."  <u>Id</u>. (original emphasis).

The court finds that defendant also has mischaracterized the permit provisions at issue.  Notwithstanding defendant's representations otherwise, the provisions do not give the Forest Service the right to use the permitted land "in any manner and for any purpose."  Def.'s Mot. Summ. J. at 13.  Rather, the rights conferred by these provisions are qualified.  For instance, clause 42 states that "the Forest Service may sell or otherwise dispose of standing merchantable timber to third parties when such timber can be felled and removed <u>without undue interference</u> with the operation of the holder."  Permit ¶ 42 (emphasis added).  Similarly, clause 58 provides the Forest Service with the right to access the premises "at all times for all lawful and proper purposes <u>not inconsistent with</u> the intent of the permit or with the reasonable exercise and enjoyment by the holder of the privileges thereof."  Permit ¶ 58 (emphasis added).  Finally, clause 66 states

that "the Forest Service reserves the right to use or permit others to use any part of the permitted area for any purpose, provided such use <u>does not interfere with the rights and privileges hereby authorized</u>." Permit ¶ 66 (emphasis added).

Although the purpose of clauses 42, 58, and 66 of the permit is to confer certain rights on the government, the clauses contain qualifying rights. Thus, defendant is prohibited from exercising its rights in a manner that poses "undue interference" with the "rights and privileges" conferred on plaintiffs. In the view of the court, the qualifying language in these clauses imposes a duty on the government, a conclusion reached in other suits against the Forest Service. <u>See, e.g., Son Broad., Inc. v. United States</u>, 52 Fed. Cl. 815, 823-24 (2002) (finding that a nonexclusive use clause, similar to clause 66 of the instant permit, "imposes binding obligations on both parties").

      2.     A Genuine Dispute of Material Facts Exists as to Whether the Forest Service Breached this Duty

Finding that clauses 42, 58, and 66 impose duties on the government, the court next considers whether defendant actually breached those duties. As plaintiffs point out, "undue" means "unreasonable," and a determination of whether defendant's actions were unreasonable is a question of fact. Pl.'s Opp'n to Mot. for Summ. J. ("Pl.'s Opp'n") at 10, July 27, 2015, ECF No. 12.

To support their claims of undue interference, plaintiffs point to the admission of Mr. Martin, a Forest Service officer, that when he approved the location of the landing area, he was not aware that the landing area had been slated for the development of three cabins, under the terms of the permit. Pl.'s Mem. for Forest Service Claims Dep't, Def.'s App. at 115; Compl. ¶¶ 30-31. As further evidence of the unreasonableness of defendant's action, plaintiffs also point to the reaction of Mr. Keith, the Chief Forester, who "was astounded by the lack of communication of the forest service personnel and logging crew with the permittees and the destruction to their permitted land." Pl.'s Mem. for FS Claims Dep't, Def.'s App. at 115. Plaintiffs add that Mr. Martin "told us after the fact that he would never have done it had he known that was part of our permit (but he also never checked)." Beard Decl. at ¶ 23. Moreover, plaintiffs state, Mr. Porter, the District Ranger, had suggested that the Beards apply to expand the bounds of the permitted area in order "to make up/substitute for the destroyed section of [the] permit." <u>Id.</u> at ¶ 25. Defendant does not dispute any of these allegations directly, and plaintiffs' claims seem to suggest that the Forest Service did not select the site for the landing out of necessity. Because the landing might have been located elsewhere without compromising the Forest Service's stewardship activities, the court finds that a genuine dispute of material fact exists as to whether defendant's actions constituted an "undue interference" with plaintiffs' rights under the permit.

17

3.      Nevertheless the Court Finds That Plaintiffs Cannot Show Damages

The court has determined that the permit imposes a duty on defendant to avoid using the permitted land in a way that "unduly interfer[es]" with plaintiffs' contractual rights, and that a genuine issue of material fact exists as to whether defendant breached that duty.  But to prevail on their breach of contract action, plaintiffs must also show, by a preponderance of the evidence, damages that are (1) reasonably foreseeable, (2) causally connected to the alleged breach, and (3) not speculative.  Liberty Ammunition, Inc., 119 Fed. Cl. at 388.  Although the Beards are not required to fully establish every element of their claim at the summary judgment stage, defendant can prevail by negating an essential element of plaintiffs' claim.  Vivid Techs., Inc., 200 F.3d at 807.

Plaintiffs assert that the creation of the log landing on the permitted area caused them to suffer a wide array of damages.  They argue, first and foremost: "[t]he aesthetic and scenic value of the land (particularly in the area where the Beards had began construction of the infrastructure for the additional chalets) has suffered harm; it is no longer viable to continue with the planned construction causing loss of future profits and loss of costs to date for planning and construction of the new chalets."  Compl. ¶ 50.  Plaintiffs also argue that they "sub-let the permitted area and sold the improvements to a third party for a price that, as a direct result of the USFS breach of the Permit Agreement, was substantially less than its value prior to the USFS breach."  Compl. ¶ 52.  In their prayer for relief, plaintiffs make additional demands, to include the loss of merchantable timber, restoration costs, and pre-judgment interest.

a.      Plaintiffs' Claim of Lost Profits Was Not Reasonably Foreseeable and the Alleged Amount of Recovery is Speculative

Defendant challenges plaintiffs' claim of lost profits through lost rent by showing that the claim was not reasonably foreseeable and that the calculation of damages would be entirely speculative.

On May 3, 2001, plaintiffs sent a letter to Mr. Porter, the District Ranger, informing him that construction of the restaurant "[would] probably never happen" due to low sales in the existing café.  Def.'s App. at 220.  Plaintiffs explained that they did not have sufficient demand to build more cabins: "[W]e currently do not have enough of a waiting list during the summer months to justify building additional cabins at this time. Our business during the winter months consists primarily of weekends, and the cabins are currently renting at a lower fee than those in Shaver Lake, probably due to our location."  Id.  Plaintiffs concluded the

18

letter by speculating that "[t]here [might] be a need in the future [for the cabins] given the growth in California's population."  Id.  Mr. Porter corroborates this writing by the Beards in his declaration and characterizes the Beards' decision not to build additional cabins as "a business decision" rather than one made on account of the logging.  Id. at 216.  Mr. Porter adds that "[t]he Beards did not raise the issue of building new cabins again with me or my staff after sending this letter in 2001."  Id.

In their responsive briefing of this summary judgment motion, plaintiffs describe their 2001 letter as an effort to reserve the right to build more cabins should "growth in California's population" drive up demand.  But the court finds this writing, devoid as it is of any specificity, entirely inadequate.  The mere possibility that demand might increase some time in the future due to a possible growth in California's population does not give the Forest Officer any meaningful notice of any future construction plans.  Furthermore, absent a timeframe for construction or evidence about how many cabins plaintiffs would have constructed but for the breach, the calculation of any damages would be entirely speculative.  It is, for example, possible that "growth in California's population" might have created sufficient demand to justify the construction of one or two additional cabins, but not three.

Plaintiffs contend that there "was no reason to 'request' to build the final six (6) chalets, as they were already authorized under the original permit."  Pl.'s Opp'n at 13.  The court, however, disagrees.  Permit clause 37 requires the permittee to submit to the Forest Service "a schedule for the progressive development of the permitted site and installation of facilities," with "an itemized priority list of planned improvements and the due date for completion."  (emphasis added).  Clause 37 also requires the permit holder to submit any construction plans at least "forty-five (45) days before the construction date stipulated in the development schedule."  Although plaintiffs initially complied with clause 37 by submitting a site schedule in 1992, plaintiffs departed from the timeline set forth in the schedule by abandoning construction of the restaurant and indefinitely deferring the construction of the six remaining cabins.  Without the required "due date for completion" and the 45-day notice for construction, further consultation with the Forest Service would have been necessary to build any additional cabins, and as Mr. Porter stated in his declaration, even if the Beards had changed their minds about constructing the additional cabins, their construction plan would have been subject to re-evaluation due to changes "in Forest plans in 2001 and 2005 that might not [have] allow[ed] [them] to construct new cabins on the land that they had proposed in the earlier 1990s."  Decl. of Ray Porter, Def.'s App at 216.

19

Mr. Beard insists that "Nancy Woolsey ([the] retired FS officer in charge of [our] permit) understood that [we] intended to build at some time in the future as she told me that since we already had installed the water, septic, and electric service in preparation of the additional chalets, [we] should look into the portable cabins like they were using at one of the resorts in Huntington Lake." Beard Decl. at ¶ 10; see also Pl.'s Opp'n at 13. In the court's view, the nature of this understanding is vague. But drawing every inference in favor of plaintiffs, the court finds that an informal familiarity with Mr. Beard's intention to build additional chalets "[at] some time in the future" did not provide defendant with adequate notice. The court cannot award damages on the mere possibility that plaintiffs might have built the additional cabins some time in the future, but for the breach.

Moreover, drawing every inference in plaintiffs' favor, the court finds that plaintiffs cannot meet this burden of proving that their damages are (1) reasonably foreseeable, (2) causally connected to the alleged breach, and (3) not speculative. Liberty Ammunition, Inc., 119 Fed. Cl. at 388. In light of plaintiffs' abandonment of the 1993 development schedule and the 2001 letter apprising Mr. Porter of their plans to indefinitely defer construction of any additional chalets, the court finds that defendant had no reasonable notice of any impending construction. Even assuming that Ms. Woolsey and Mr. Beard had some sort of an understanding that Mr. Beard intended to build "[at] some time in the future," the absence of any concrete plan or timeframe dooms plaintiffs' case.

Accordingly, the court finds that even if a breach of contract did occur, plaintiffs cannot recover their alleged damages as they were speculative and not reasonably foreseeable by the Forest Service.

> **b.** The Court Denies Plaintiffs' Claim of Lost Value on the Sale of the Improvements and the Sublease of the Permitted Area

Plaintiffs argue that they "sub-let the permitted area and sold the improvements to a third party for a price that, as a direct result of the USFS breach of the Permit Agreement, was substantially less than its value prior to the USFS breach." Compl. ¶ 52.

As the court has already found, plaintiffs' claim of lost profits from the cabins was not reasonably foreseeable because the Beards had effectively abandoned construction of the cabins; thus, any lost income is too speculative to calculate. This same reasoning also precludes plaintiffs from obtaining relief on their claims for lost value on the sale of the improvements and the sublease of the permitted area; that is, because the construction of the cabins was not foreseeable,

the possibility that plaintiffs might decide to sell those improvements and sublet the permitted area due to the frustration of their putative development plans is equally unforeseeable. The court finds no proximate causal relationship between the alleged breach and plaintiffs' decision to sell the improvements. Neither the timing of plaintiffs' decision to sell the improvements nor the market conditions at the time was foreseeable.

> c.   The Court Finds No Grounds for an Award of Other Damages Claimed by Plaintiffs

Although plaintiffs primarily seek damages for their inability to build the three cabins located in the area cleared by the logging company, plaintiffs also, in the barest of terms, allege damage to "the overall aesthetic and scenic value of the property," that caused a loss of resort revenues. Compl. ¶ 51. The court finds this general claim of aesthetic harm speculative and not amenable to calculation. Plaintiffs provide no evidence whatsoever as to how the removal of trees in 16% of the permitted area negatively affect resort revenues. Nor have plaintiffs made any showing that demand for the four existing cabins had declined.

Moreover, plaintiffs' demand for loss of merchantable timber cannot stand because the property interest in the cut timber belongs to the government, not plaintiffs. See, e.g., Permit ¶ 4—Development ("Trees or shrubbery on the permitted area may be removed or destroyed only after the forest officer in charge has approved, and has marked or otherwise designated that which may be removed or destroyed. Timber cut or destroyed will be paid for by the permittee as follows . . .") (emphasis added); Permit ¶ 46—Timber Payment ("All National Forest timber cut or destroyed [by permittee] in the construction of the permitted improvements shall be paid for at current stumpage rates for similar timber in the National Forest"); see also Permit ¶ 42 (conferring on the Forest Service the right to dispose of merchantable timber).

Plaintiffs also seek "restoration costs." But plaintiffs are not entitled to recover for the costs of restoring the vegetation to the area cleared for the log landing because plaintiffs do not have a property interest in the land itself or in the timber located in the land. Rather, plaintiffs have a right to use of the land without undue interference. This right of use must be balanced against the Forest Service's contractual right to dispose of timber and its statutory duty to prevent forest fires. In light of plaintiffs' apparent abandonment of the construction of the additional cabins, the court finds that plaintiffs cannot recover these costs.

Finally, plaintiffs request pre-judgment interest. The Court of Federal Claims, however, is without authority to grant interest on a claim unless a contract

or statute expressly provides for such an award.  28 U.S.C. § 2516(a).  Neither the permit nor any pertinent statute contains a provision for interest payments in this case.

Thus, although the court finds that a genuine dispute of material fact exists as to whether defendant breached the terms of the permit, the court also finds plaintiffs' demand for damages must fail.  A showing of damages is an essential element of a breach of contract claim.  Liberty Ammunition, Inc., 119 Fed. Cl. 368 at 388.  Because plaintiff cannot make a prima facie claim of breach of contract, defendant is entitled to summary judgment.


IV.     Conclusion


For the reasons set forth above, defendant's MOTION for summary judgment is GRANTED.  The Clerk is directed to enter judgment accordingly.


IT IS SO ORDERED.


 s/ Patricia Campbell-Smith                    
PATRICIA CAMPBELL-SMITH
Chief Judge